## Case No. 16,081.

### UNITED STATES v. POYLLON et al.

[1 Car. Law Repos. 60.]

District Court, D. New York. Nov., 1812.

EMBARGO LAWS—ACTION OF DEBT ON BOND—PENAL ACTION.

[An action of debt upon a bond given under the embargo laws, and conditioned that the cargo laden upon a vessel should be landed in some port of the United States, is, in effect, a penal

or criminal action, as the right of recovery rests upon the violation of positive statutory prohibitions; and hence the jury in such an action are judges both of the law and the facts.]

This was an action of debt, on a bond for the sum of 23,000 dollars, given in December, 1808, under the first embargo law, conditioned, that a cargo of cotton, laden on board the schooner Clarinda, bound for Boston, should be landed in some port of the United States (dangers of the seas excepted). The defendants, Kip and Adams, one owner of the cargo, and the other master of the vessel, were principals, and the other defendants merely sureties in the bond.

In support of their plea, that the cargo was prevented from being re-landed in the United States by the dangers of the seas, the defendants produced one William Lea, who testified that he sailed about the 15th of December, 1808, in the British schooner Hercules, bound to St. John's, N B.; that on Wednesday, the 28th of said month, saw the Clarinda, crossing Nantucket shoals, hoist a signal of distress; upon which the Hercules, being seven or eight miles ahead, slackened sail; and when the Clarinda came up, Adams, the master, requested aid to save his vessel and cargo and the lives of his crew. The schooner Clarinda being in a sinking condition, the cotton was unshipped and taken on board the Hercules; being then about 20 miles from the land, and the Clarinda full of water up to the hatches, it was found necessary to abandon her. Upon his cross-examination, he stated that the Hercules, after passing through Hellgate, came to anchor about night; the next morning got under way, and proceeded as far as New-London, put in there, the weather being squally, and remained two or three days. That the Hercules next put into Tarpaulin Cove, on account of the weather being foggy, and lay there also two or three days; and on the third day proceeded to Holmes's Hole, where she continued several days, when he thinks she might have proceeded. That on the 27th the Clarinda also arrived there, and the captains of both vessels, with the supercargo of the Clarinda, went ashore together. The next morning the Hercules sailed, and was followed in about an hour afterwards by the Clarinda. The Hercules outsailed the Clarinda, so as to leave her nearly out of sight, except with a spy-glass, but did not shorten sail on that account until the signal of distress, which happened about one o'clock; and about 11 o'clock, the captain of the Hercules ordered the ballast to be levelled, and a chest, with two casks of water, to be removed from the run; and about 4 o'clock p. m. the vessels came along side of each other.

The defendants resting their evidence here, Baldwin, for plaintiff, opened; and, admitting that the Clarinda had twice struck,—once in coming out of New-London, and again off Connecticut Point,—proceeded to shew that the loss was notwithstanding

fraudulent and by design; and for this purpose called one Daniel Boyles, who testified that he was a seaman on board the Clarinda during the said voyage; that they first fell in with the Hercules at Holmes's Hole, but had previously put into New-London and Tarpaulin Cove; that when at this place, Capt. Adams, seeing a vessel coming at a distance, said to the supercargo, Kip. "That is not the vessel"; and, again, when they descried the Hercules at Holmes's Hole, he heard Capt. Adams exclaim, "That is the vessel!" He further testified that the Clarinda first began to leak the day of their leaving Holmes's Hole, and was pumped dry by 10 o'clock in the morning; that when they went to dinner, she leaked again, upon which he wanted to try the pumps, but the captain or mate told him not to do it, but go and coil the cables and rigging; that he advised the captain to run her ashore on Nantucket Shoals, as she leaked so badly; but he replied, "We will go on board that schooner," meaning the Hercules, then in sight, and which had waited for them on perceiving their signal of distress. He gave it as his opinion, that the leak was occasioned by design, and not accident. On his cross-examination, he stated that he had been maintained three or four years by the custom-house at five dollars per week, to give testimony in this cause, and that Mr. Schenck paid his salary. A protest was also produced, in which he joined with the rest of the crew, attributing the leak to her striking on the rocks.

The plaintiffs next produced in evidence a petition presented by the defendants, Poillon, Busze, and Bergh, to the secretary of the treasury, for relief against the bonds in question, with their examination taken before Judge Tallmadge on that occasion, in which they confessed that they "believed" the loss to have happened by "fraud of the master and supercargo," but had "no knowledge" that such was the case.

The defendants' counsel opposed the introduction of this evidence, on the ground that the petitioners had objected at the time to being examined as to their "belief," but were forced to do it or to withdraw their petition. The court, however, admitted it.

The evidence being closed, Messrs. Baldwin and Ogden, in favor of the plaintiff, addressed the jury in a very able manner; and, bringing before them in a clear and luminous point of view, all the evidence which tended to establish their case, besought them to decide impartially between the two parties; and reminded them that they sat there, as jurors, not as legislators, and whatever might be their individual opinions as to the expediency of any particular law, still it was their duty, as good citizens, to support and execute it.

Mr. Griffin then alone summed up the evidence on the part of the defendants, with his usual animation and impressiveness.—(Col. Burr confining himself merely to the reading

of some law to the court, and making a few appropriate remarks thereon.)—After an appeal to the sympathy of the jury, by shewing that a verdict for the plaintiff would be equivalent to a sentence of perpetual imprisonment on his unfortunate clients, as they were utterly unable to satisfy it with their property, he proceeded, in substance, as follows:

That the question to be decided was whether the Clarinda had been lost by the perils of the seas; that the present suit, though in form a civil action, was in effect a penal or criminal action, inasmuch as the plaintiff's right to recover (if at all) must be founded on the violation of a positive statute of the United States; and that his clients, therefore, standing in the doubly favored situation of defendants in a criminal or penal action, and sureties for others, were entitled to the judgment of the jury on both the law and fact, and to the benefit of all those mild and favorable rules and maxims which had been established by the benignant genius of the "common law," in the construction of the law and evidence.

The loss being proved to have happened at sea, it should be presumed that it had been occasioned fairly by the perils of the sea; fraud should not be intended, but must be strictly proved. How do the United States prove fraud in this instance? They cannot do it by endeavoring to impress into their service the enforcing act, which requires that the loss should be proved by all the crew (if living, and the proof of their death should lie on the defendants). To apply this law to the case arising under a different law, and before its enactment, would be to convert it into an ex post facto law; and however agreeable this might be to some gentlemen, by putting money into their pockets, and enabling them to ride in their carriages, and keep town houses and country seats, it will never be sanctioned, or tolerated by this court or jury. But, the plaintiffs triumphantly ask why, even if not bound to do so, we did not produce the mate and crew of the Clarinda. The answer is at hand—and when heard will be approved by the heart and judgment of every man: We were not rich enough to keep them here. They are scattered, perhaps, to the four winds of Heaven, by their different pursuits, or by the terrible penalties of the embargo law and its horrid train shaking over their heads. Our "poverty, not our will," consented to their departure. We have always been anxious to meet the trial. It might have been tried before, and had it not been thus long delayed, our witnesses would not have been thus scattered. Let not then what was our misfortune, be imputed to us a fault.

Do they prove the fraud by the movements of the Hercules? Are we to be answerable for them, even were they extraordinary or suspicious? But it was not at all extraordinary that a strange vessel, navigated by strangers, and in a strange and intricate sea, at an inclement season of the year, should frequently retire into port for shelter and safety; nor is it at all remarkable or suspicious that a cautious commander should level his ballast when passing over shoals.

Is the fraud proved to your satisfaction by Boyles, the great champion of the custom-house? How painful soever it may be to my feelings to speak harshly of the motives or conduct of a fellow-creature, I am compelled, by professional duty to my clients, to say this man stands before you convicted of perjury, either now or in his protest made at St. John's. Which is the most probable? Then, when by the loss of the vessel his pay had ceased; when if he had suspected any fraud he must have glowed with indignation at the conduct of the men who had thus wantonly endangered his life and put an end to his earnings; and when he nevertheless declared under oath that he verily believed the leak and subsequent loss of the Clarinda was occasioned by striking on the rocks?—Or, is he now perjured, when he comes before you, and audaciously contradicts his solemn protest, after being three or four years maintained by the custom-house at five dollars a week? On the rotten testimony of this man, I would not, gentlemen, condemn a dog to one day's imprisonment—much less would I consign four fellow-citizens to imprisonment for life, or at the mercy of the executive. I have no fear for the result of your decision. By the acquittal of the defendants, you will this day teach the gentlemen of the custom-house that this practice of maintaining witnesses at enormous wages for a length of years is equally useless and abominable.

Lastly, is the fraud proved by the extorted confession of the defendants' belief? It was no admission of facts; for they knew of none to admit, but such as they had already in the honesty of their hearts fully disclosed. But on what did they found their belief? Not on information derived from Kip or Adams; for it is not even to be imagined that these men would say to them thus: "You have benevolently become our sureties, and we, to repay your kindness, have acted like villains, have fraudulently destroyed the vessel, carried the cargo to a foreign country, and thereby subjected you to all the penalties of the law." Their belief was more probably founded on the hue and cry, the declarations and threats of the custom-house officers. In a moment of despondency they have perhaps imagined and believed whatever was most disastrous, and with a vague hope of mercy, indiscreetly avowed their fluctuating belief. To turn such confessions against them is cruel and ungenerous in the extreme. It is what every mind amongst you would revolt from without hesitation. But whatever may have been their belief—whatever may have been your own, uncertain belief, you must not judge according to that. You are sworn to decide upon the evidence; and the evi-

dence must be strong and conclusive before you can conscientiously pronounce a verdict of guilty.

Is fraud to be inferred from the manner in which the vessel was lost? It appears that she began to leak and had four feet of water in her hold, when the Hercules was out of sight, except with a spy-glass, and they were distant many miles from land. Would men lightly expose their lives to such danger, with the weight of a guilty conscience hanging on them? And what are the assignable inducements to encounter these perils? The profits on a few bales of cotton, purchased by the certain loss of the vessel. You will reject them as insufficient, and will not suspect that fraud could have existed where there was so little motive for it.

Baldwin & Ogden, for the United States.
Radcliffe, Griffin & Burr, for defendants.

VAN NESS, District Judge (charging jury), said, among other things, that this was in its nature and essence, though not in its form, a penal or criminal action; and they were therefore entitled to judge both of the law and the fact; and that the enforcing act could not apply in this case.

The jury retired, and, after being out between one and two hours, agreed upon a verdict for the defendants, which was sealed up, and the next morning opened and pronounced in court.